Okay, when you're ready. Good afternoon, your honors. May it please the court, Lois Boback for Tustin Police Officer Villarreal. This is a tragic case, there's no question about that. But Officer Villarreal was required to make a split-second life-and-death decision. What required him to do that? It doesn't look to me as though he was the initiator. The fact that Mr. Herrera, first of all, he had been acting erratically before the shots were fired. He kept his hand in the front pocket of his city sweatshirt. He moved from a place of relative safety on the shoulder of the road into the roadway. He was skipping back and forth. But if we're talking about Officer Villarreal, how much did he know about the prior behavior? He saw all of that. I looked at the dash cam from the two vehicles. His is the second vehicle that arrives, correct? Correct. So he didn't see all of it? Well, he said that he saw Mr. Herrera on the shoulder of the roadway because he could see that before Officer Miali's car blocked his view of Mr. Herrera. So he saw him on the shoulder of the roadway with his hand out of his pocket. Then he saw him when he moved in front of Officer Miali's car out of a position of relative safety into the roadway. He saw him skipping and running backwards in the street, all the while holding his hand in his pocket. I have to say what you're saying is inconsistent with what I saw on his own camera. That is to say the point at which he began to get close enough to see anything. Some of that earlier stuff was on the other camera, but not on his. I don't recall at what point his camera was turned on. His camera was turned on well before he got to the scene. He testified in deposition that he saw Mr. Herrera on the side of the road and then he saw... Well, he can testify to what he wants to testify to, but I want to tell you what I saw on his own camera tells me that the earlier part of this he did not see, could not see. I understand your point, Your Honor. He certainly was able to see Mr. Herrera in the street. Oh, sure. And he saw him with his hand in his front in the street, so he knew he must have come from somewhere. But he had his hand in the front pocket of his hoodie. He was acting strangely. I mean, he was skipping backwards in the street. He was running backwards in the street. And then as the officers moved to box him in, the moment at which he had to make his decision, at the time that he ordered Mr. Herrera to take his hand out of his pocket or to show his hand, his intention was, once the hand was out of the pocket, assuming that Mr. Herrera had calmly stood where he was and moved his hand out of his pocket, his intention was to put Mr. Herrera into a control position, to get him down on his knees or down on his stomach on the ground so that they could take him into custody. That was his intention, you say? That was his intention, and that's in his deposition. I'm relying on what's on the videotape, and now this is in Officer Villarreal's car. I hear him say, take your hand out of your pocket, and I hear the gunshot almost simultaneously. Exactly. They cannot be separated by more than a second. And that's exactly the time period when Officer Villarreal had to make his decision. He was asked in deposition, well, what were you going to do when you asked him to take his hand out of his pocket? Well, I was going to put him in a control position. That's what he intended to do. So he's taking his hand out of his pocket. Yes. And as he's obeying the officer's command, he gets shot. But it's the way that he does it, Your Honor. He didn't just stand still and take his hand calmly out of his pocket. As soon as he began to take his hand out of his pocket, he also moved quickly toward the front windshield, the front passenger window of Officer Villarreal's car, and brought his hand up in an arcing motion. That's when Officer Villarreal had to decide, is he doing this peacefully, or does he have something in his hand that could be a threat to me and is my life in danger? Well, right there. He had a fraction of a second to make that decision. Well, don't we have to view this in the light most favorable to the plaintiff here? I mean, and so if we do what you just said right now, offer two possibilities. He did it peaceably or he did it in reaction. So I'm just struggling with, in light of the standard that we have here, Mr. Herrera was arguably complying with Officer Villarreal's order to remove his hand from his pocket at the time that he was shot. So if that is the case, how is it that we determine that we should grant qualified immunity? Because qualified immunity allows for police officers to make mistakes. It allows for the possibility that officers will make mistakes in judgment. And that's exactly what happened here. Officer Villarreal had a choice to make. Do I wait and see whether there's something in the hand that could kill me, or do I shoot? And he made the decision to fire. We know with the benefit of hindsight, obviously, that that was wrong. Is it significant that Officer, is it Miali? Miali. Didn't fire? Chose not to fire? I mean, it seems like he had a better vantage point possibly than Mr. Villarreal. He actually didn't, for these reasons. First of all, well, I'll answer your question directly and then I'd like to go back to the standard. Officer Miali was facing, from his point of view, he saw Mr. Herrera's back, not Mr. Herrera's front. So he couldn't see, and he testified in his deposition, that he couldn't see Mr. Herrera's hands as they were coming out of his pocket. He also, if he had fired, he would have fired toward an apartment complex. Officer Villarreal fired toward a block wall. Officer Villarreal fired, didn't fire in the direction of anyone other than Mr. Herrera. Of, Mr. Miali would have had to fire potentially in, in the direction of, in the videos you can see that there are other cars. So there are other people that could have been hit by a, by a bullet from Mr., from Officer Miali's gun. But aside from that, Your Honor, the, the standard is whether or not it was objective, reasonable, what, reasonable. Whether or not every reasonable police officer faced with exactly the same search, circumstances that Officer Villarreal faced would have concluded that firing under those circumstances would have been a violation of the Fourth Amendment. The fact that one reasonable officer decided not to shoot, and his circumstances are slightly different, but the fact that one person decided not to shoot doesn't mean that it wasn't objectively reasonable for Officer Villarreal to shoot. I guess the issue I'm having here is that these are arguments, in my mind, for a jury. That certainly you can lay these out, but we're at a very limited scope here. This is not jury redo. We have to determine based on the facts as alleged by the plaintiff. Right. And they're going to, they're going to say, no, it was, he simply had his hand in his pocket and these officers were coming up on him really strong. They, they, they created the tension. They rose the adrenaline, not him. You have to lay out, take their facts, not the facts as you want. You got to take, stick with their facts and explain why under their facts, you win as a matter of law. I agree, Your Honor. And right now we're talking about your facts. As long as. Stick with theirs. As long as the historic facts are undisputed, the question of whether or not Officer Villarreal's actions were reasonable is a question of law. It's not a question that you give to a jury, because we don't want juries second guessing the very, very difficult life and death decisions that officers have to make. I agree. But at this day, again, again, this is not an argument to a jury. For us to have even have jurisdiction over this case. Right. At this stage, we have to accept their version of the facts. So you need to explain under their versions of the facts. Why as a matter of law, you win. Under their version of the facts. Nobody disputes that, that Mr. Herrera was acting erratically. No one disputes that he was skipping backwards in the street. That's very strange behavior. Nobody disputes that it was almost simultaneous when Officer Villarreal or directed or ordered Mr. Herrera to remove his hand from his from his pocket that he started moving toward Officer Villarreal's car and that he had his hand going up in an arcing motion. That's on the video. That's undisputable. So if we take those facts, if we take those facts, you're saying that as a matter of law, Officer Villarreal, the shooting here was legal. Yes, it was objectively reasonable. Well, not just those facts. Officer Villarreal knew that Mr. Herrera was a suspect in a domestic violence incident. He knew that he had gang affiliation, that he was on parole, that he had a warrant out for his arrest. All of those things factor in. On parole. I don't remember. On parole, they said? On parole, yes. And there was a warrant out for his arrest. What do we know about what Officer Villarreal knew with respect to whether he was armed? We know that dispatch told Officer Villarreal and Officer Miali that Mr. Herrera was not known to be armed. But that's not the same thing as saying he wasn't armed. If they had gotten a call that said, through dispatch, that said he's not armed, we know for a fact that he's not armed, this case might be different. But they were told he's not known to be armed.  But doesn't our opinion at Espinoza clearly favor or somewhat favor denial of qualified immunity at the, under these circumstances? I don't know if you're familiar with Espinoza, but it seems to be. I'm sorry, Your Honor, I don't believe that I'm familiar with the Espinoza case. In Espinoza, the suspect had refused to put up his hands, had threatened the officers, and an officer believed that she saw something in the suspect's hands, saw him move his arm, and was worried he was going to shoot her. Yet we affirm the denial of qualifying immunity in part because the suspect had not brandished a weapon or spoken of a weapon. I do recall that case, Your Honor. Espinoza v. City and County of San Francisco? Yes. I think that one of the things that the court said in that case was that there was a dispute about the historic evidence. Some of the officers argued or said that one of the things that they believed gave them exigent circumstances to go into the house and go into the attic was the fact that they saw a bloody shirt. And some of the officers said it looked like fresh blood. Other officers said it looked like dried blood. And so whether or not there were exigent circumstances, whether it was— But here, the domestic violence incident was over. Yes, and there— So, I mean, how does that strengthen your case? I mean, that was—if you're arguing that it was an ongoing domestic violence— No, it wasn't an ongoing domestic violence incident, but he was—they were investigating. He was a suspect in a domestic violence incident in which he was—it was reported that he hit somebody on the head. That was the purpose for stopping him. And at the time, they knew that he was on parole, that there was a warrant out for his arrest, that he had known gang affiliations. And all of those things factor into, am I afraid of this encounter, or do I think that this is going to be a perfectly safe encounter? And everything that they observed, or a lot of the things that they observed, heightened the—heightened the situation to a point where it was objectively reasonable for the officers. Nobody disputes that, for example, that it wasn't objectively reasonable for the officers to have their guns out. They were going to do a felony stop. Domestic violence under California law is a felony. So they had their guns out. There's some question about whether or not there were other alternatives available. Well, in the split second that that decision had to be made, you couldn't put the gun down and pick up a baton. You couldn't put the gun down and pick up a taser, assuming that Officer Villarreal even had a taser. I think there's testimony in the record that he didn't have a taser available to him. He had to make a decision based solely on what he knew at the time. And it's easy for us to sit in hindsight and say, well, Mr. Herrera didn't have a gun. Mr. Herrera didn't really pose any threat. I don't think anyone here said that one time. No, I— I think what we're focusing on, again, the narrow standard we have to deal with here, and that's what we're dealing with. This is not a jury trial. This is not summary judgment. It's a very limited thing. No one here has raised the fact that he didn't have a gun. I understand. The trial court did. And that's not what we're doing right now. Again, this is not trial court part two. This is a very limited inquiry of what we have to do here. I understand, Your Honor. I'd like to reserve a minute and a half or so of my time, but I'd like to just briefly respond. The standard of review on qualified immunity, again, it allows for reasonable mistakes. And as long as the mistake was objectively reasonable, then Officer Villarreal is entitled to qualified immunity. I'd like to reserve the balance of my time. Let's hear from the other side, and you will have some time. Thank you. Good afternoon, everyone. My name is Dale Gallipo, and I'm representing or speaking on behalf of the appellees and the plaintiffs in the underlying case. I think the comment made, a lot of the arguments we believe they're being made here are more appropriate for a jury, because in this case, there are a host of undisputed facts that we actually think favor the finding of the district court judge. And there's other facts that I think are either disputed or they're entitled to different reasonable inferences. And as I think was pointed out, for this limited purpose of today's hearing, one has to take all the plaintiff's facts as true and all reasonable inferences in their favor. Well, let's look at what's undisputed, because I think it's a really interesting question we have here. When we look at what's undisputed, Mr. Herrera, I think you could say suspiciously, kept his hand in his pocket and that the officers perceived a heavy object in that pocket. That's... First part, yes. Second part, a little less clear. But I think there's no question that he had his hand in his pocket. Well, and both officers said it looked like he had something heavy in his pocket. All right. And then just before Mr. Viala opened fire, Mr. Herrera rapidly removed his hand and moved quickly, it seemed like, toward the officer's car. Why isn't that enough? Well, because sticking on the undisputed facts, the officers had no information that any weapon was involved in a crime. They were specifically told he was not known to carry weapons. They were... He responded to a command. He was given a command, he has a hand in his pocket, and he was given a command to show his hands or take his hand out of his pocket. The officer was asked, what was your intention? I wanted him to take his hand out of his pocket. He took his... One reasonable inference, again, is he took his hand out of his pocket in compliance with the command of the officer. When he took his hand out of his pocket, he had nothing in his hand. Another reasonable inference is that the officer could see that he had nothing in his hand before he fired his shots. Officer... And what do you say in response to opposing counsels that he's entitled to make a reasonable mistake? Well, if that was the standard alone, then every single shooting case, the defense would mistake, and that's the end of the analysis. I think for purposes here, one has to look at the facts supporting the plaintiff's version and then decide whether one can say as a matter of law that the shooting is justified. Under our version, both hands were visible, and he had nothing in his hands, and he was shot twice and killed. We specifically asked the officers about their training, and they conceded, which is included in the cites in our brief, that deadly force is a last resort, only to be used in the direst of circumstances, only when no other reasonable measures are available, and that a warning that deadly force is going to be used should be given when practical. Officer Maile, based on his training, said, I was watching very carefully, and unless I saw a gun come out of his pocket and point in our direction, I was not going to shoot. I saw his hand come out of his pocket. I saw nothing in his hand. I did not shoot. And so we believe if one takes all reasonable inferences in our favor, one could say he was complying with the command of the officer. He took his hand out. He had nothing in his hand. Both hands are now visible with nothing in them. We believe that's a don't shoot scenario. And even if one could argue, as counsel did, well, this is happening quickly. Officers are in a position to make difficult decisions. We believe that's a more appropriate argument for a jury. It's not an argument that lets them prevail as a matter of law, and we believe the district court got this right when she really carefully looked at this and decided this is really a jury question. Some of the other things that I think were mentioned were that the officers boxing him in, and we believe that played a part in the dynamics in his movement. It was also noted that he didn't take his hand out of his pocket and simulate a gun or point it at someone as if he had a gun, and so, you know, I made a list of some of the undisputed facts. And that would have made a difference if he had. Maybe. If he had. Maybe. Now, if it looked like he had a gun, in other words, if the officer would have testified, if the evidence was clear that he pulled an object out of his pocket that everyone thought was a gun and it looked to be pointed at the officer, maybe it's different. But in here, you know, when you ask the officers, when you saw the hand come out of the hand, no. Did you ever see a gun at any time? No. Did you ever see anything that looked like a gun at any time? No. So we believe that's what makes this case different. And I think if this case hopefully is set to trial, both sides have good arguments to make to a jury, but we think a jury has to decide these disputed facts, has to decide the inferences that can be drawn from these facts, and ultimately decide whether they think the shooting was excessive or not. Part of our further argument is we believe that a jury could find that Officer Maile acted more reasonably by not shooting, given his observations and testimony, than the shooting officer did. And I think a jury can conclude that his decision not to shoot when he saw the hand come out of the pocket with nothing in it was a more appropriate decision. I don't know if any of you have any other questions for me right now. OK. Thank you. Thank you very much. You've saved some time. Thank you, Your Honor. Just a few things I'd like to point out in my limited time. One in, I apologize if I mispronounce these, Peng v. Peng-Hu, 2003, Ninth Circuit case, 335 F. 3rd, 970. The Court said that when the historic facts are undisputed and the only dispute is the inferences that can be drawn from those undisputed historic facts, then this was a probable cause case. The question of probable cause is a question of law for the Court to make. We, juries should not be put in a position of second guessing whether or not an officer acted in a reasonable manner or not. The only province of the jury is to decide the undisputed facts. And I would submit that we don't really have any material undisputed facts in this case. We can see what happened on the video. Counsel, we have jury trials on this all the time. And the police officer will bring in their use of force expert. And Mr. Gallipo will bring in his use of force expert to talk about what should have happened. I mean, juries do make determinations. But they're not making determinations on qualified immunity. And that's the only issue in this appeal, qualified immunity, and whether or not the actions of Officer Villarreal were objectively reasonable in light of all of the circumstances. You said something that confused me. The jury does not get to decide qualified immunity? Qualified immunity is a question of law for the Court. You mean, so depending on the jury, the jury has to decide whether or not there's been a constitutional violation. And at trial, the jury cannot say to your officer, you're off the hook because you have qualified immunity? That can't be right. It's my understanding that the application of qualified immunity is a question of law. Well, it is a question of law on undisputed facts or facts taken in favor of the other side. But I've never understood it to be outside the province of the jury when it goes to trial to say that the officer does not have qualified immunity. The jury has to decide the underlying predicate facts. I understand that. But I think I'm arguing on your point, if we send this back, I don't think you want to say qualified immunity is no longer available to you at trial. Absolutely not. Well, I think that's what you just said. That's why I'm speaking up. That was not my intention at all. And if the jury were to return a verdict against Officer Villarreal, I think that he would have the opportunity to file a motion for judgment notwithstanding the verdict on qualified immunity. We're just looking right now on the undisputed facts in the light most favorable to the plaintiff, whether or not Officer Villarreal is entitled to qualified immunity. That's correct. That's what this court is looking for. Right. And if we, in looking at the facts and the reasonable inference, you know, most favorable to Mr. Herrera and that there may be reasonable inferences that can be drawn from those facts or differences of opinion on what can be drawn from those facts, then we may not be able to make that determination as a matter of law. But you, when it goes back to trial, if that's the result here, can certainly argue to the jury why Officer Villarreal should not be held responsible and set forth that he should be immune from this, based on all the facts that are presented. I agree with Your Honor that if this court finds that there is a disputed material fact relevant to the application of qualified immunity, then the case has to go back, the district court's decision has to be affirmed. I think that on the record before the court, the videotape evidence, the deposition testimony that we have, shows that Mr. Herrera's actions, Officer Villarreal's actions are not in dispute. We know what happened. And it's just a question of whether or not a reasonable police officer, knowing the same things that Officer Villarreal knew, would have felt justified in firing. This is a question that's off to one side from the merits of the question we are now being asked to decide. So I want to make that clear. But I would like to know if you can answer this. If everything goes bad for your client, that is to say, if we send it back, if the jury says no qualified immunity, and if the jury comes in with an award of some amount of damages, will your client pay those damages out of his own It should be 99.9% of the times it's paid by the employer. I don't see why it would be different. Well, by statute, California statute says it's paid by the employer unless they're punitives. Yes. Isn't that right? That was what I was going to say. So that doesn't say 99%. It says 100. Well, I was going to say, unless there are punitive damages, the city would have the option of deciding whether to pay those punitives. My understanding is that... At that point, I got the answer. At that point, I think the employer has the option. Yeah. Yes. Okay. Thank you, Your Honor. Thank you, Counsel. Thank both sides for their quite helpful arguments. The last case on the argument...
judges: W. Fletcher, Murguia, Owens